**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JOEY ELIJIO ADAMES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-20-594-G** |
| | ) | |
| **SCOTT CROW, Director,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, John M. O'Connor, appearing on behalf of the above-named Respondent, in response to the Petition for Writ of Habeas Corpus on file herein shows the court as follows:

1.  Petitioner, Joey Elijio Adames, an inmate in the custody of the Lawton Correctional Facility, has filed with this Court a petition seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254, as well as a brief in support.  Docs. 1, 2.

2.  Petitioner is currently incarcerated pursuant to a Judgment and Sentence entered in the District Court of Canadian County, Case No. CF-2017-256, for jury convictions of Conspiracy to Distribute a Controlled Dangerous Substance, in violation of OKLA. STAT. tit. 63, § 2-408 (2011) (Count 1) and Unlawful Possession of a Firearm by a Convicted Felon, in violation of OKLA. STAT. tit. 21, § 1283 (Supp. 2014) (Count 3),[1] both counts After Former Conviction of Two or More Felonies (Exhibit "1," Summary

---

[1] Petitioner was found not guilty of a third count, Count 2, Trafficking in Illegal Drugs, in violation of OKLA. STAT. tit. 63, § 2-415 (Supp. 2015).

1

Opinion).  *See also* Doc. 10-1.[2]  The jury fixed punishment at thirty-five years imprisonment on Count 1 and ten years imprisonment on Count 3, and the trial court sentenced Petitioner in accordance with the jury's verdicts and ordered the sentences to be served consecutively (Exhibit 1 at 2).[3]

3.     The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Petitioner's convictions and sentences on direct appeal on June 27, 2019, in Case No. F-2018-411 (Exhibit 1 at 3; Brief of Appellant, Exhibit "2"; Brief of Appellee, Exhibit "3").  *See also* Doc. 10-2 (Brief of Appellant).[4]

---

[2] Some exhibits included with this Response were previously submitted as attachments to Respondent's Motion to Dismiss and Brief in Support.  Respondent does not wish to unnecessarily lengthen the record with duplicative documents; however, Respondent is also aware of his obligations under Rule 5 and the fact that this Court may prefer to have all relevant exhibits attached to this operative pleading.  *See* Rule 5(d)(1), *Rules Governing 2254 Proceedings* ("[t]he respondent must also file with the answer a copy of" the briefs and opinions from state court).  Accordingly, Respondent has attached any exhibits called for by Rule 5 but has also included a "*see also*" cite to where the document was previously submitted, if applicable, so the record is clear on which documents are duplicates.  Finally, except where otherwise noted, Respondent's page citations are to the original page numbering of each document, as opposed to the CM/ECF header pagination.

[3] Petitioner had *six* prior felony convictions: (1) Unlawful Distribution of a Controlled Dangerous Substance in Canadian County Case No. CF-2008-143; (2) Unlawful Distribution of a Controlled Dangerous Substance in Canadian County Case No. CF-2009-135; (3) Domestic Assault and Battery with a Dangerous Weapon in Canadian County Case No. CF-2015-112 (Count 1); (4) Domestic Assault and Battery with a Dangerous Weapon in Canadian County Case No. CF-2015-112 (Count 2); (5) Forgery in the Second Degree in Oklahoma County Case No. CF-2010-5554; and (6) Assault With a Dangerous Weapon in Oklahoma County Case No. CF-2011-707.

[4] Petitioner's trial was a dual proceeding covering both a trial for the new crimes at issue in this habeas proceeding as well as a revocation proceeding of his suspended sentences in Canadian County District Court Case No. CF-2015-112 (Exhibit 1 at 1-3).  The OCCA's opinion on direct appeal both affirmed Petitioner's new convictions and sentences and the revocation of his suspended sentences in Case No. CF-2015-112 (Exhibit 1 at 3).  However, Petitioner has raised no claims in his habeas petition that relate to Case No. CF-2015-112.

4.     On June 22, 2020, Petitioner, appearing *pro se*, filed the instant habeas petition and brief in support (Docs. 1, 2).  On August 12, 2020, Respondent moved to dismiss on grounds that Petitioner's petition was entirely unexhausted, as none of his claims was presented on direct appeal, and he was not entitled to a *Rhines*[5] stay.  Docs. 9, 10.  In a Report and Recommendation ("R&R") issued on October 19, 2020, the Magistrate Judge agreed with Respondent that Petitioner's claims were unexhausted, but recommended against dismissing the action and instead concluded that an administrative closure was warranted while Petitioner exhausted his claims in state court.  Doc. 12.

5.     Meanwhile, in state court, on September 21, 2020, Petitioner filed an Application for Post-Conviction Relief (Application for Post-Conviction Relief, Brief in Support, and Attachments, Exhibit "4").  Following a Response by the State, the state district court denied post-conviction relief (Response to Defendant's Application for Post-Conviction Relief, Exhibit "5"; Order Denying Application for Post-Conviction Relief, Exhibit "6").

6.     Petitioner appealed the denial of post-conviction relief to the OCCA in Case No. PC-2021-20 (Petition in Error, Exhibit "7"; Brief in Support, Exhibit "8").  On March 5, 2021, the OCCA affirmed the denial of post-conviction relief (Order Affirming Denial of Application for Post-Conviction Relief, Exhibit "9").

7.     Back in federal court, Petitioner filed multiple notices of the completion of his post-conviction proceedings.  Docs. 13, 14, 15, 16.  On November 10, 2021, this Court

---

[5] *Rhines v. Weber*, 544 U.S. 269 (2005).

issued an order on the R&R, noting that, in light of Petitioner's notices regarding exhaustion, "[i]t thus appear[ed] that the Court may properly give further consideration to the habeas claims raised by the Petition."  Doc. 17 at 2.  This Court adopted the R&R and re-referred the matter to the Magistrate Judge for further proceedings.  Doc. 17 at 2.  The Magistrate Judge then ordered a Response to the petition, Doc. 18, resulting in the instant filing.

7.      It appears Petitioner has exhausted his state court remedies with respect the grounds for relief raised.

8.      It appears the petition is timely filed.

9.      The following transcripts are available: Preliminary hearing held on August 28, 2017; Motions hearing held on November 7, 2017; Transcript of Trial Proceedings (3 volumes) had on April 9–11, 2018; and Sentencing proceeding had on April 17, 2018. Complete copies of these transcripts—as well as the trial exhibits and original record—are being conventionally filed along with this Response.  Relevant portions of the transcripts are attached to this Response as Exhibit "10."  Relevant portions of the original record are attached to this Response as Exhibit "11."

10.      Respondent is not aware of any proceedings that have been recorded but not transcribed.

11.      Petitioner is not entitled to an evidentiary hearing.  This Court's review of Petitioner's habeas petition is limited to the record that was before the OCCA when it adjudicated his claims on the merits.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Furthermore, as will be shown, Petitioner fails to show that the OCCA's adjudication of

4

his claims resulted in unreasonable determinations of law or fact under 28 U.S.C. § 2254(d).

## STATEMENT OF THE FACTS

In 2017, Investigator Bradley Neff, a narcotics investigator for the Canadian County Sheriff's Office Narcotics Unit, had information that drugs were being dealt out of a particular residence in Mustang, Oklahoma, located in Canadian County (Exhibit 10, Tr. I, 150, 153-54). On February 9, 2017, Investigator Neff conducted surveillance and watched the residence to look for foot traffic and vehicle traffic that "comes and stays a short amount of time and leaves" (Exhibit 10, Tr. I, 154-55, 222-23). Investigator Neff testified that a regular feature of a narcotics transaction is that they are very short (Exhibit 10, Tr. I, 155). Within about an hour of watching the house, Investigator Neff saw one person come on foot and leave within a few minutes and saw another person come in a vehicle and leave within a few minutes (Exhibit 10, Tr. I, 156). A third visit occurred, this one again via a vehicle, with two male subjects exiting the car and entering the house; the vehicle left shortly thereafter (Exhibit 10, Tr. I, 156-57). Investigator Neff joined in a traffic stop of the vehicle, which was occupied by Kendra Williams (Exhibit 10, Tr. I, 158). Investigator Neff was asked to join in the traffic stop because Williams wanted to cooperate, had narcotics, and was leaving a house that he suspected was a drug house (Exhibit 10, Tr. I, 158). Investigator Neff took what he learned from Williams and wrote and obtained a search warrant for the house (Exhibit 10, Tr. I, 158-59).

On the morning of February 10, 2017, officers executed the search warrant and detained Brock Laurent[6] and Eric Julian who were in the house (hereafter "first search") (Exhibit 10, Tr. I, 160, 178).  Petitioner was not present (Exhibit 10, Tr. I, 161).[7]  On the floor in the living room, officers found a blue bag that contained a spoon, several syringes, snorting tubes, a metal tin, and a baggie containing what officers suspected was heroin (Exhibit 10, Tr. I, 164-67; St. Ex. 2).  The items were one of the first things one would see if one walked through the front door and signified to Investigator Neff that everyone in the house was aware of them (Exhibit 10, Tr. I, 167).  On a chair in the living room, officers found a little plastic container that contained brown cotton swabs or cigarette butts that had heroin in them from a previous drawing of heroin in addition to a spoon that had brown reddish residue on it, which Investigator Neff testified could be either blood or heroin (Exhibit 10, Tr. I, 167-69; St. Ex 3).  In the living room, officers found approximately 4.5 grams of heroin and 0.8 grams of methamphetamine (Exhibit 10, Tr. I, 181).[8]

In the far back bedroom, ("bedroom one"), there was a large speaker with an orange ribbon or tourniquet and a syringe with some white residue on it with another spoon used to hold heroin contained in a gray shaving bag along with Julian's driver's license (Exhibit

---

[6] Respondent will refer to Brock Laurent as "Laurent."  Laurent's father, David Laurent, referenced for the first time below, will be referred to by both first and last name to avoid confusion.

[7] On cross-examination, Investigator Neff testified a search was performed later in the day on February 10, 2017, on a "Green Gate house" and that Petitioner was arrested in a traffic stop somewhere in the neighborhood of the Green Gate house after Investigator Neff saw Petitioner's vehicle leaving the Green Gate house (Exhibit 10, Tr. I, 226-27).

[8] Officers also found two credit cards in Laurent's name in the living room (Exhibit 10, Tr. I, 211-12).

10, Tr. I, 169-72, 210, 212; St. Exs. 1, 4-7).[9]  Subsequently, at trial, Julian testified that the tourniquet, needle, and heroin was his and that he got the heroin from Petitioner (Exhibit 10, Tr. I, 266).  In bedroom one, officers also found several bags of heroin, as confirmed through a field test (Exhibit 10, Tr. I, 173; St. Ex. 5).  Officers found 8.25 grams of heroin in one of the bags and 3.75 grams in the rest of the bags (Exhibit 10, Tr. I, 174).[10]  Officers found Laurent and Julian in bedroom one (Exhibit 10, Tr. I, 171-72, 175; St. Ex. 7). In bedroom one, officers also found a large black duffle bag that contained a letter or envelope with "Joey A." written on it, along with Petitioner's social security card and birth certificate (Exhibit 10, Tr. I, 179-81; St. Exs. 9-11).

In bedroom two, officers found a small unlocked safe that contained hundreds of small baggies and identification papers with Petitioner's name on them (Exhibit 10, Tr. I, 175-77; St. Ex. 8).  Investigator Neff testified that the small baggies showed an intent to distribute because generally a distributor packages drugs in smaller amounts for sale (Exhibit 10, Tr. I, 177).  Investigator Neff's experience was that a mere user would not have hundreds of baggies (Exhibit 10, Tr. I, 178).  At the conclusion of the search, Laurent and Julian were taken to jail (Exhibit 10, Tr. I, 181).

---

[9] State's Exhibit 1 is a diagram of the interior of the house (Exhibit 10, Tr. I, 161-63).  The far back bedroom is labeled on Exhibit 1 as "Bedroom One." (Exhibit 10, Tr. I, 164; St. Ex. 1).  The front left bedroom is labeled on Exhibit 1 as "Bedroom Two," and the front right bedroom is labeled as "Bedroom Three." (St. Ex. 1).

[10] Investigator Neff testified that the typical use weight of heroin for one injection is one-tenth a gram (Exhibit 10, Tr. I, 174).

After Laurent was in custody, Investigator Neff had conversations with him about the organization of Petitioner's drug distribution and about additional heroin that was missed in the house (Exhibit 10, Tr. I, 192; Tr. II, 161). Laurent gave Investigator Neff consent to search the house again, and Investigator Neff returned to the house on February 12, 2017 to conduct a second search (hereinafter "second search") (Exhibit 10, Tr. I, 183). Laurent was present at the time of the second search along with his father, who had a key to get into the house (Exhibit 10, Tr. I, 183). Investigator Neff had information there was heroin in a shoe in the back closet, and Investigator Neff found a white Nike Air Max shoe in a closet in bedroom one (Exhibit 10, Tr. I, 184; St. Ex. 12). The shoe contained 34.34 grams of heroin in a plastic baggie, which was wrapped in a purple bandana (Exhibit 10, Tr. I, 188; Tr. II, 119; St. Ex. 13). Investigator Neff estimated the street value of the heroin seized was approximately $5,000 and characterized it as a "very large amount" (Exhibit 10, Tr. I, 198). A wallet containing Petitioner's ID was also in the closet on a shelf (Exhibit 10, Tr. I, 215).

Laurent testified he was the primary resident of the house in February 2017 and that his grandfather owned it but did not live there (Exhibit 10, Tr. II, 14). Laurent testified Petitioner would regularly be present at the house (Exhibit 10, Tr. II, 14). Laurent was friends with Petitioner for most of his life and testified Petitioner began to supply him with heroin in approximately October 2016 (Exhibit 10, Tr. II, 17). Although Laurent considered himself to be an addict, he did not consider Petitioner an addict (Exhibit 10, Tr. II, 28). Laurent never saw Petitioner use heroin but occasionally he would do other drugs for fun (Exhibit 10, Tr. II, 28).

Initially, Petitioner would bring heroin over to Laurent's house in return for money (Exhibit 10, Tr. II, 18). Eventually, Laurent became involved as more than simply a customer (Exhibit 10, Tr. II, 18). Laurent would drive Petitioner to Dallas or to the WinStar Casino near the state line to pick up heroin (Exhibit 10, Tr. II, 18, 22). Laurent would also hold the product for Petitioner and get rid of it as needed (Exhibit 10, Tr. II, 18). Laurent testified that when he went with Petitioner they would pick up approximately three to five ounces of heroin at a time for the purpose of selling it and take it to Laurent's house (Exhibit 10, Tr. II, 22). Laurent testified he never went to Dallas or to the WinStar Casino without Petitioner, but Petitioner would go without him (Exhibit 10, Tr. II, 22-23). Laurent knew Petitioner had gone without him because Petitioner would show up to his house with the heroin when Petitioner returned (Exhibit 10, Tr. II, 23).

Laurent had discussions with Petitioner about the source of his supply (Exhibit 10, Tr. II, 23). When they went to the WinStar Casino, the source of supply was Petitioner's father's uncle, Danny, and when they met in Dallas, the source of supply was Petitioner's father (Exhibit 10, Tr. II, 23). Laurent testified Petitioner would pay his father or his father's uncle $700 for an ounce, which was a substantial discount from the amount it sold for (Exhibit 10, Tr. II, 34). Laurent testified that in early 2017, there was typically three to twelve ounces in the house, depending on how many times Petitioner went and picked up more (Exhibit 10, Tr. II, 34). Laurent and Petitioner would go resupply about once or twice a week from approximately November/December until February (Exhibit 10, Tr. II, 34). Laurent also saw Petitioner "cut" the heroin by adding a powder to make it not as strong and to add more weight to it (Exhibit 10, Tr. II, 35).

9

Laurent also testified that if Petitioner was not around and someone called Petitioner and "needed something, it was all kept at my house, so [Petitioner] would call me and I would go meet him or they would come over depending on if I knew them or not.  Just more at his discretion; do whatever he wanted me to do." (Exhibit 10, Tr. II, 29-30).  If Petitioner wanted Laurent to get cash from the customer or if Petitioner was going to give them drugs "on front" without money and get the money later, then Laurent would do what Petitioner said to do (Exhibit 10, Tr. II, 30).[11]  Laurent testified that Petitioner would direct him to either meet someone to distribute heroin or someone would come over to his house to distribute heroin more than once a day (Exhibit 10, Tr. II, 30).  Laurent testified that on a typical day, an ounce or two of heroin was sold out of his house (Exhibit 10, Tr. II, 36).  Most of the customers were Petitioner's customers, and approximately fifteen to twenty percent of the customers were Laurent's customers (Exhibit 10, Tr. II, 36).  Laurent got his supply of heroin from Petitioner (Exhibit 10, Tr. II, 36).  Laurent testified that Petitioner had no regular employment around February 2017 but frequently had cash around the house from selling drugs (Exhibit 10, Tr. II, 23-24).

Laurent and Petitioner also talked about what would happen if they got "busted." (Exhibit 10, Tr. II, 43).  Petitioner told Laurent if he was in the house when it happened,

---

[11] Laurent explained to give a customer the heroin "on front" meant to give it to them without any money, and Petitioner would get the money from the customer later (Exhibit 10, Tr. II, 36-37).  Laurent explained the purpose of giving a heroin addict the drugs "on front" was to give them a little bit of heroin so the addict was not "sick" or having withdrawal symptoms and would go find a way to get the money (Exhibit 10, Tr. II, 37).  Laurent testified this was a fairly common practice for Petitioner's customers (Exhibit 10, Tr. II, 37).

that he would take the blame for everything (Exhibit 10, Tr. II, 43).  If Petitioner was not in the house, he told Laurent, "it wouldn't matter if me and ten other people pointed the finger at him in court, he still couldn't get charged with it." (Exhibit 10, Tr. II, 43). Petitioner said this numerous times (Exhibit 10, Tr. II, 43).

Around the time of the first search of Laurent's house, Petitioner had been staying there regularly for a couple of months (Exhibit 10, Tr. II, 24).  Petitioner's room was the very back room with the large square black speaker (bedroom one) (Exhibit 10, Tr. II, 24-25).  Laurent testified that Petitioner had a black bag and a little safe, but that the safe was in Laurent's room at the time of the first search because Julian was spending the night, although it normally would have been in Petitioner's room (Exhibit 10, Tr. II, 25).  Laurent testified that he had opened the safe more than once and that it typically contained diabetic syringe needles and papers, including Petitioner's social security card (Exhibit 10, Tr. II, 26-27).[12]  Laurent also testified that the black duffle bag belonged to Petitioner and that all of his clothes were in the bag along with papers with Petitioner's name on them (Exhibit 10, Tr. II, 27-28).  The black duffle bag was normally kept in the room where Petitioner stayed with the black speaker (bedroom one) (Exhibit 10, Tr. II, 28-29).

The day before the first search, Petitioner sent Laurent a text message asking Laurent "wheres [sic] my shit?", referring to Petitioner's heroin (Exhibit 10, Tr. II, 45-46;

---

[12] Laurent testified his needles were in the safe and were for shooting up heroin (Exhibit 10, Tr. II, 27).

St. Ex. 14, p. 50).[13]   Petitioner again texted, "wheres my shit dude im at ur house [sic]"
(Exhibit 10, Tr. II, 46; St. Ex. 14, p. 50).   Laurent replied, "you told me to give Eric 3 a
couple nights ago and then last night you told me to give him another 2 so if you had 38
that would be 32 left now that's five grams total you had me give him[.]" (Exhibit 10, Tr.
II, 46-47; St. Ex. 14, p. 50).   The next text Petitioner sent asked Laurent to bring him home
a Dr. Pepper (Exhibit 10, Tr. II, 47-48; St. Ex. 14, p. 50).   Laurent testified that Petitioner
would normally call him, and if Laurent did not answer, Petitioner would text him "what's
up?" and Laurent would call him back (Exhibit 10, Tr. II, 72).   Laurent would receive
instructions about to whom and what drugs to distribute during the phone calls (Exhibit 10,
Tr. II, 72).

Laurent testified that the night before the first search, Williams, Petitioner's
customer, dropped off Petitioner and Julian at the house, and picked up a little heroin and
a little bit of methamphetamine, and left (Exhibit 10, Tr. II, 31).   The large package of
heroin, which Laurent estimated was thirty-two grams, was in the living room at that time
(Exhibit 10, Tr. II, 32).   When Williams left, Laurent saw Petitioner conceal it, and it was
in his shoe in the closet (Exhibit 10, Tr. II, 32).

Julian testified for the State that his family raised Petitioner, and he acquired heroin
from Petitioner approximately one-hundred times, typically at Laurent's house (Exhibit 10,
Tr. I, 256, 258).   Julian testified that Laurent was a facilitator for Petitioner (Exhibit 10, Tr.
I, 258).   Julian would call Petitioner to see if he could get heroin, and Petitioner would

---

[13] State's Exhibit 14 is text messages from Laurent's phone (Exhibit 10, Tr. II, 43-44).   The
dates of the text messages are listed in day/month/year format (Exhibit 10, Tr. II, 45).

either meet him or direct Julian to Laurent's house (Exhibit 10, Tr. I, 259).  Julian observed Petitioner give or sell heroin to Laurent and personally observed Petitioner in distribution activity hundreds of times (Exhibit 10, Tr. I, 259, 263-64).  Julian testified that Petitioner would keep the majority of his heroin supply in the safe at Laurent's house (Exhibit 10, Tr. I, 259).  Julian would be at Laurent's house approximately every other day to obtain heroin, and Petitioner would frequently be there as well (Exhibit 10, Tr. I, 260).  Julian did not know Petitioner to have a regular job, had reason to believe he had substantial amounts of money, and saw him receive money for heroin (Exhibit 10, Tr. I, 260).  Petitioner told Julian the heroin came from his uncle in Dallas, and Julian testified Petitioner would acquire heroin from his uncle about once a week (Exhibit 10, Tr. I, 261).  Petitioner typically relied on other people for transportation, and Julian gave Petitioner rides around town to drop off heroin and transported Petitioner to Laurent's house to make a sale (Exhibit 10, Tr. I, 264-65).

State's witness Dale Crookshanks met Petitioner in the Canadian County Jail in October 2017 (Exhibit 12, Tr. II, 77, 80).  Petitioner told Crookshanks that Williams left Laurent's house, got pulled over with a couple of pills, and Williams told police about the heroin in the home trying to get herself out of trouble (Exhibit 12, Tr. II, 85).  Petitioner told Crookshanks that Laurent often took him to Dallas or to WinStar to pick up the heroin and that Laurent was helping him distribute it throughout Canadian County (Exhibit 12, Tr. II, 85-86).  Petitioner told Crookshanks he was getting the heroin from his uncle and sometimes his dad in Dallas (Exhibit 12, Tr. II, 86).  Petitioner also asked Crookshanks to hire a different attorney for him (Exhibit 12, Tr. II, 89).  Crookshanks told Petitioner that

if he got out, he was not going to have the money to hire Petitioner an attorney (Exhibit 12, Tr. II, 89). Petitioner gave Crookshanks a recipe on how to make methamphetamine and gave Crookshanks his uncle's phone number to help Crookshanks get heroin to get Petitioner a new attorney, and Crookshanks wrote the number down on an envelope (Exhibit 12, Tr. II, 86-89, 95; St. Ex. 15). Petitioner told Crookshanks to write down "Gotti" as the name, but he believed the number was for Petitioner's Uncle Daniel (Exhibit 12, Tr. II, 89; St. Ex. 15).

Finally, relevant to Count 3, felon in possession of a firearm, during the second search of Laurent's house, Investigator Neff also retrieved a Bernardelli .380-caliber handgun from the trunk of the car belonging to David Laurent, Laurent's father (Exhibit 12, Tr. III, 11-14; St. Ex. 17). Investigator Neff removed the magazine from the gun, examined the rounds, and noted the maker of the ammunition was PMC and the rounds were also .380-caliber (Exhibit 12, Tr. III, 15-16). Investigator Neff testified that during the first search, the black duffle bag found in the back bedroom, bedroom one, contained a box of .380-caliber ammunition, made by PMC (Exhibit 12, Tr. III, 16-18; St. Ex. 18). The black duffle bag also contained a leather pouch with numerous papers with Petitioner's name (Exhibit 12, Tr. III, 18). Officers also found Petitioner's Oklahoma DOC identification card in bedroom one (Exhibit 12, Tr. III, 19-23; St. Ex. 19). Laurent testified he saw Petitioner in possession of a handgun almost every day (Exhibit 12, Tr. III, 33). Laurent could not pronounce the kind of gun but it was something like "Bertaloni," and he recalled it was .38-caliber (Exhibit 12, Tr. II, 33). Laurent recognized the gun at trial as one of the guns he saw in Petitioner's possession (Exhibit 12, Tr. II, 33). Petitioner told

Laurent he bought the gun from his friend, Robert Hughes, in exchange for $500 cash and $500 of heroin (Exhibit 12, Tr. III, 34).  Laurent testified Petitioner kept the ammunition for the gun in his black bag in the back bedroom with all of his clothes (bedroom one) (Exhibit 12, Tr. III, 34-35).  Crookshanks testified that Petitioner told him he had a .380-caliber handgun and Petitioner was hoping he would not be charged with possession of the gun because it was found after he was arrested (Exhibit 12, Tr. III, 44-45).[14]  The predicate offense for Count 3 was a 2011 felony conviction for Distribution of Controlled Dangerous Substance (Exhibit 12, Tr. III, 56; St. Ex. 20).

Additional facts will be presented below as they become relevant.

## STANDARD OF REVIEW

**A.      28 U.S.C. § 2254(d) Deference**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief with respect to a claim adjudicated on the merits by a state court only if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[14] Crookshanks testified that Petitioner told him he obtained the gun from Shane Warden and did not mention Robert Hughes (Exhibit 10, Tr. III, 45-46).  Crookshanks testified that Petitioner told him he and Warden were best friends and that Warden would let Petitioner crash on his couch as long as Petitioner supplied him with drugs to use (Exhibit 10, Tr. II, 83).  Julian testified he transported Petitioner to Warden's house on one occasion to sell heroin (Exhibit 10, Tr. I, 264-65).

28 U.S.C. § 2254(d).

The threshold question for this Court on habeas review is whether Petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time his conviction became final. *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*." *Id.* at 1016. Where there is no clearly established federal law, that ends this Court's inquiry under § 2254(d)(1). *See id.* at 1018.

If a clearly established rule of federal law is implicated, however, then this Court must decide whether the state court's decision was contrary to, or an unreasonable application of, that clearly established rule of federal law. *See id.* A state court decision is contrary to clearly established federal law as determined by the Supreme Court when it applies a rule that contradicts the governing law set forth in the Supreme Court's cases or decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001).

A state court decision involves an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States when the state court correctly identifies the governing legal principle but applies it to the facts of the particular case in an unreasonable manner. *Valdez v. Bravo*, 373 F.3d 1093, 1096 (10th Cir. 2004); *Gilbert v. Mullin*, 302 F.3d 1166, 1171 (10th Cir. 2002). The Supreme Court has explained as follows regarding the "unreasonable application" clause:

> In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 411.

The Supreme Court has further held that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). As the Tenth Circuit has explained, the fairminded jurist test is a way of measuring reasonableness:

> The Court's "fairminded jurists" test . . . serves as a proxy for "unreasonable application." It is designed to help federal courts reviewing § 2254 habeas motions to determine whether a state court decision that would be incorrect under de novo review is also unreasonable. Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.

*Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014). *Frost* further stated that federal courts

> may issue the writ only when the petitioner shows there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents. Thus, even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable. If this standard is difficult to meet—and it is—that is because it was meant to be. Indeed, AEDPA stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Accordingly, we will not lightly conclude that a State's criminal justice system has

experienced the extreme malfunction for which federal habeas relief is the remedy.

*Id.* at 1223 (quotation marks and citations omitted, alterations adopted, emphasis in original).  This "fairminded jurists" standard applies to the determination of whether there exists clearly established federal law, as well as to the contrary to and unreasonable application clauses of § 2254(d)(1) and to § 2254(d)(2).  *See Dunn v. Madison*, 138 S. Ct. 9, 10 (2017) (*per curiam*); *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015); *White v. Woodall*, 572 U.S. 415, 427 (2014).

In addition, state court determinations of fact "shall be presumed correct" unless Petitioner rebuts the presumption by "clear and convincing evidence."   28 U.S.C. § 2254(e)(1).  Thus, a state court's decision cannot be said to be based on an unreasonable determination of the facts until a petitioner has shown by clear and convincing evidence that the state court's factual determination was incorrect.  *Black v. Workman*, 682 F.3d 880, 896-97 (10th Cir. 2012) (refusing to grant relief under § 2254(d)(2) because the petitioner had failed to present clear and convincing evidence to rebut a state court's factual finding); *but see Wood v. Allen*, 558 U.S. 290, 300-01 (2010) (declining to decide the relationship between § 2254(d)(2) and § 2254(e)(1)); *(John) Grant v. Trammell*, 727 F.3d 1006, 1024 n.6 (10th Cir. 2013) (same); *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004) (holding that § 2254(d)(2) applies to challenges based solely on the state court record whereas § 2254(e)(1) applies when the petitioner relies upon new evidence).

**B.    Clearly Established Law on Ineffective Assistance Claims**

All three of Petitioner's grounds for relief allege the ineffective assistance of appellate counsel.  Doc. 1 at 6-7, 9; Doc. 2 at 2-9.  To establish constitutionally ineffective counsel, Petitioner must show both (1) that his attorney's performance was deficient and (2) that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  As to performance, Petitioner bears the burden of proving that counsel's performance was unreasonable, and this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 687, 689.  As to prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

The *Strickland* standard is highly deferential, and when it applies in tandem with AEDPA deference, the resulting standard of review is "doubly" deferential to the state court's decision.  *Richter*, 562 U.S. at 105.  Accordingly, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.* Thus, this Court must "determine what arguments or theories supported, or could have supported, the state-court decision and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with a prior decision of [the Supreme] Court."  *Id.* at 102.

Regarding the prejudice standard, the "likelihood of a different result must be substantial, not just conceivable."  *Id.* at 112.  "Counsel's errors must be so serious as to

deprive the Petitioner of a fair trial, a trial whose result is reliable." *Id.* at 104 (quotation marks omitted).  Petitioner need not show that counsel's actions more likely than not altered the outcome, "but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." *Id.* at 111-12 (quotation marks omitted).

Finally, the same standard applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Therefore, Petitioner must show that appellate counsel's performance was unreasonable and that he suffered prejudice, that is, that there is a reasonable probability that, had the errors now complained of been raised, the result of his appeal would have been different. *Id.* at 285.

If appellate counsel files a brief on the merits, he should not raise every nonfrivolous claim. *Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004).  Rather, appellate counsel may select from among claims in order to maximize the likelihood of success. *Id.* Therefore, it is difficult to establish that appellate counsel was ineffective for failing to raise a particular issue. *Id.*

In order to determine whether appellate counsel's decision not to raise a particular issue constituted deficient performance, it is necessary to evaluate the merits of the omitted claim. *Id.* If the issue was so plainly meritorious that it would have been unreasonable to exclude it, even if the appeal was otherwise strong, then counsel's performance may have been unreasonable. *Id.* If the issue has some merit, but is not so compelling that its exclusion would have been unreasonable, then its merit should be weighed against the rest of the appeal, taking into account the deference that a court must give to any professional

judgment on the part of counsel. *Id.* Finally, if the issue is meritless, counsel was not deficient for failing to raise it. *Id.*

An appellate attorney must select out those claims he believes, in light of his professional judgment, have the best chances of success. *See Jones v. Barnes*, 463 U.S. 745, 751-53 (1983). Although the Supreme Court has suggested that "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim," it has also acknowledged that "it is difficult to demonstrate that counsel was incompetent" in selecting the issues she did raise. *Robbins*, 528 U.S. at 288. Only when ignored claims are clearly stronger than those raised will a petitioner be able to prevail. *Id.*

## ARGUMENT AND AUTHORITY

### GROUND ONE

**THE OCCA'S REJECTION OF PETITIONER'S INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIM FOR FAILING TO RAISE A "CHAIN OF CUSTODY" PROPOSITION WAS NEITHER CONTRARY TO *STRICKLAND V. WASHINGTON* NOR LEGALLY OR FACTUALLY UNREASONABLE.**

In his first ground for relief, Petitioner alleges ineffective assistance of appellate counsel based on his direct appeal attorney's failure to challenge the "chain of custody" as to the gun he was found guilty of possessing, as a convicted felon, in Count 3. Doc. 1 at 6; Doc. 2 at 3-6. As shown below, the OCCA rejected this claim on the merits, correctly identifying *Strickland v. Washington* and reasonably applying it, legally and factually, to Petitioner's case. Habeas relief must be denied.

A.    **Background**

On direct appeal, appellate counsel, Robert Jackson, raised the following claims:

(1)    whether [Petitioner] was denied a fair trial because of prosecutorial misconduct throughout closing argument;

(2)    whether he was denied a fair sentencing proceeding because of prosecutorial misconduct; and

(3)    whether the Order revoking his suspended sentences is valid.

(Exhibit 1 at 3; *see also* Exhibit 2 at i, 8-18).

In his post-conviction proceedings, Petitioner raised Ground One of the present habeas petition, contending appellate counsel was ineffective for failing, *inter alia*, to "challenge the chain of custody regarding the .380 caliber Bernardelli Pistol" that Petitioner was convicted of unlawfully possessing, as a convicted felon, in Count 3 (Exhibit 4 at 3, 13-16).[15,16]   Doc. 1 at 6; Doc. 2 at 3-6.   The state district court, through the Honorable Judge Paul Hesse, rejected this claim, reasoning that the underlying ground Petitioner wished for appellate counsel to have raised lacked merit:

> The .380 caliber pistol at issue was introduced during the testimony of Investigator Bradley Neff.  (Plaintiffs Trial Exhibit 17).  Neff testified that he retrieved a Bernardelli .380 handgun from the trunk of David Laurent's father's car during the second search of Laurent's house.  The handgun was later placed in a box for storage and the box was labeled in Neff's handwriting with a description of the handgun and location where the

---

[15] Due to a lack of original page numbering, citations to Exhibit 4 are to the electronically stamped CM/ECF pagination.

[16] In the form post-conviction application submitted by Petitioner, he (perhaps misunderstanding the form's instructions) listed grounds from direct appeal in Propositions Two and Three, even stating as to each issue that it "was raised on Direct Appeal."  (Exhibit 4 at 4-5).  In any event, Petitioner does not raise these claims in the present proceeding, so this portion of his post-conviction application is not discussed further.

handgun was found.  At trial, Neff identified both the box and the handgun. Trial counsel only objected to the admission of the handgun on the limited ground that there was no evidence linking the handgun "to the elements of this crime." (Tr.  III, pg.  14).  There was no objection on chain of custody grounds.  The chain of custody of the firearm was adequately established and a rational trier of fact could reasonably conclude that the handgun introduced at trial was the same handgun found in the trunk of Laurent's father's car. It's worth noting that the purpose of the chain-of-custody rule is to ensure that the physical evidence against the accused has not been tampered with or altered.  There is no evidence that this occurred.

(Exhibit 6 at 2).

On appeal, the OCCA affirmed, rejecting all of Petitioner's ineffective assistance of

appellate counsel claims in a joint discussion:

> [Judge Hesse] denied Petitioner's claims of ineffective assistance of appellate counsel on their merits.  Judge Hesse determined that appellate counsel's performance was not objectively unreasonable and that Petitioner failed to demonstrate a reasonable probability that due to the alleged errors the outcome of the appeal would have been different.  We agree.

> Except as related to his ineffective assistance of appellate counsel claim, consideration of Petitioner's claims for relief are procedurally barred. *Id.*; *Fowler v. State*, 1995 OK CR 29, ¶ 2, 896 P.2d 566, 569; *Walker v. State*, 1992 OK CR 10, ¶ 6, 826 P.2d 1002, 1004.  Petitioner's remaining claim is that his appellate counsel was ineffective because appellate counsel inadequately raised or did not raise the grounds for relief he now raises in his application for post-conviction relief.

> Claims of ineffective assistance of appellate counsel may be raised for the first time on post-conviction as it is usually a petitioner's first opportunity to allege and argue the issue.  As set forth in *Logan*, 2013 OK CR 2, ¶ 5, 293 P.3d at 973, post-conviction claims of ineffective assistance of appellate counsel are reviewed under the standard for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Smith v. Robbins*, 528 U.S. 259, 289 (2000) ("[Petitioner] must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of appellate counsel.").  Under *Strickland*, a petitioner must show both (1) deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error, the result

of the proceeding would have been different. *Strickland*, 466 U.S. at 687-89. And we recognize that "[a] court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689).

We set forth in *Logan* that in reviewing a claim of ineffective assistance of appellate counsel under *Strickland*, a court must look to the merits of the issues that appellate counsel failed to raise. *Logan*, 2013 OK CR 2, ¶¶ 5-7, 293 P.3d at 973-74. Only an examination of the merits of any omitted issues will reveal whether appellate counsel's performance was deficient and also whether the failure to raise the omitted issue on appeal prejudiced the defendant; i.e., whether there is a reasonable probability that raising the omitted issue would have resulted in a different outcome in the defendant's direct appeal. *Id.*

We find no merit in the claim that Petitioner was denied effective assistance of appellate counsel as alleged in his post-conviction application.

(Exhibit 9 at 2-4).

## B.     Application of § 2254(d)

Petitioner has failed to demonstrate that no fairminded jurist could agree with the OCCA's rejection of his claim of ineffective assistance of appellate counsel for failing to challenge the "chain of custody" as to the .380 caliber gun.[17] To begin with, the OCCA's decision was clearly not contrary to clearly established Supreme Court law, as the OCCA

---

[17] The OCCA clearly rejected both prongs of Petitioner's ineffective assistance of appellate counsel claim on the merits, and thus, he must overcome § 2254(d) deference on both prongs (Exhibit 9 at 2 ("Judge Hesse determined that appellate counsel's performance was not objectively unreasonable and that Petitioner failed to demonstrate a reasonable probability that due to the alleged errors the outcome of the appeal would have been different. We agree.")). Moreover, the fact that the OCCA summarily concluded that Petitioner had not shown ineffective assistance does not change the deference due its decision. *See Richter*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

correctly identified *Strickland* and its two-part test as governing this claim (Exhibit 9 at 3).

*See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405-06 ("contrary to" prong implicated

where state court applies a rule that contradicts that provided by the Supreme Court).  While

of course the OCCA was not required to cite, or even be aware of, the Supreme Court's

precedents, *see Early v. Packer*, 537 U.S. 3, 8 (2002), the fact that the OCCA did correctly

cite and define *Strickland*'s standard means Petitioner cannot show that the OCCA's

decision was contrary to Supreme Court law, *see Hooks v. Workman*, 689 F.3d 1148, 1167

(10th Cir. 2012) (where "the OCCA's decision, on its face, applied the correct standard of

appellate review," "the OCCA's decision was not 'contrary to' clearly established federal

law").

Nor was the OCCA's opinion legally or factually unreasonable under the remaining

provisions of § 2254(d).  As background, under Oklahoma law on chain of custody,

> the party who offers demonstrative evidence must show, to the satisfaction
> of the trial judge, that the circumstances of its custody provide reasonable
> certainty that there has been no alteration of or tampering with that evidence.
> However, we have made it clear that this burden does not require that all
> possibility of alteration, however slight, must be negated by the party
> offering the evidence.  Once it has been shown to the court that the evidence
> was preserved under circumstances reasonably certain to maintain its
> integrity, it is proper for the trial judge to admit the evidence and let what
> doubt there may be go to its weight.

*Hays v. State*, 617 P.2d 223, 228 (Okla. Crim. App. 1980).  Even "a gap in the chain of

custody" as to a piece of evidence is not necessarily fatal to its admission.  *See id.*  For

instance, where "because of the character of the exhibit," the proffering party is able to

offer "sufficient identification," the evidence may be admitted.  *Id.*  In *Hays*, the OCCA

reasoned that a gap in the chain of custody as to cowboy boots was not fatal to their

admission because it "does not raise the same grave concern that a similar break would cause when dealing with contraband substances, wherein a chemical analysis is necessary for identification and a layman would be unable to identify the substance as the same substance taken under a particular set of circumstances." *Id.* In sum, "the evidence in question was preserved under circumstances reasonably certain to maintain its integrity," and "[t]he allegation that there was a possibility for tampering with the evidence is nothing but bare speculation." *Id.*

In *Nelson v. State*, 687 P.2d 744, 746 (Okla. Crim. App. 1984), the OCCA applied the reasoning of *Hays* to a chain-of-custody challenge raised as to a gun, reiterating that "[t]he purpose of the chain-of-custody rule is to ensure that the physical evidence against the accused has not been tampered with or altered," and "this burden does not require that all possibility of altercation, however slight, must be negated by the party offering the evidence." Where Nelson did "not allege any altercation or tampering occurred," but argued only that "there was a break in the chain of custody, and as a result, the gun automatically should have been ruled inadmissible," the OCCA "disagree[d]." *Nelson*, 687 P.2d at 746. Like the cowboy boots in *Hays*, the OCCA found a gun did not require "strict application of the chain of custody rule in contraband cases" where the evidence is "susceptible to tampering and altercation." *Id.* "[A]ny discrepancies in the identification of the firearm at trial go to the weight and credibility of the evidence rather than admissibility." *Id.*

Here, as the state district court explained and as the OCCA appeared to find persuasive,[18] the record simply did not support any grounds for challenging chain of custody on the gun (Exhibit 6 at 2). During the second search, Investigator Neff personally retrieved the Bernardelli .380-caliber handgun from the trunk of Laurent's father's car (Exhibit 12, Tr. III, 11-14; St. Ex. 17). Investigator Neff removed the magazine from the gun, examined the rounds, and noted the maker of the ammunition was PMC and the rounds were also .380-caliber (Exhibit 12, Tr. III, 15-16). Investigator Neff himself placed the gun in a storage box labeled, in Neff's handwriting, with a description of the handgun and location where the handgun was found:

> Received from 641 West Perry, B. Laurent, by B. Neff, 2/12/14, 2145 hours, Bernardelli model .80, serial number 13313, .380 caliber, country of origin US, Italy, importer Interarms, case number 1700140, offense, possession of a firearm after former conviction.

(Exhibit 12, Tr. III, 12-13). At trial, Neff identified both the box and the handgun and specifically testified the handgun in the box was the same one he retrieved from the car (Exhibit 12, Tr. III, 12-14).

Thus, the record does not suggest even a break in custody, let alone an opportunity for tampering to have occurred. Indeed, even if there had been a break in custody or

---

[18] The focus of the § 2254(d) analysis is on the opinion of the OCCA, but the OCCA specifically noted its agreement with the district court's determination that Petitioner had not shown ineffective assistance (Exhibit 9 at 2). Moreover, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102. The state district court's reasoning for denying relief provided arguments that "could have" supported the OCCA's decision and are helpful to this Court's § 2254(d) analysis.

opportunity for tampering, Oklahoma law does not consider a gun to be the type of evidence susceptible to tampering. *See Nelson*, 687 P.2d at 746; *Hays*, 617 P.2d at 228. Moreover, based on Investigator Nuff's storage of the gun in the box, which was labeled in excruciating detail, "the evidence in question was preserved under circumstances reasonably certain to maintain its integrity." *Hays*, 617 P.2d at 228. Both in state court and this Court, Petitioner offers nothing beyond "bare speculation" that tampering could have occurred, which is insufficient to show the gun should have been excluded. *Id.* For all these reasons, the OCCA quite reasonably concluded that appellate counsel was not ineffective in failing to challenge the admission of the gun on appeal on chain of custody grounds.

In his arguments to this Court and in state court, Petitioner seems to misunderstand the meaning of "chain of custody" under Oklahoma law and appears to invoke the phrase to challenge whether the evidence was sufficient to link him to the gun (*see* Exhibit 5 at 5 (observation by the State, in responding to Petitioner's claim in his post-conviction application, that "Petitioner does not contend that the gun was tampered with or altered, he merely complains that the evidence was insufficient to link him to its possession")). As in state court (Exhibit 4 at 13-14), Petitioner raises a litany of alleged shortcomings in the State's case that he possessed the gun, complaining, as examples, that the gun was retrieved from an interested party (*i.e.*, David Laurent, the father of Laurent, who turned State's evidence), the gun was not discovered until the second search, and no "forensic evidence . . . corroborated actual possession by Petitioner." Doc. 1 at 6; Doc. 2 at 3-4.

However, it is clear why appellate counsel reasonably chose not to challenge the sufficiency of the evidence supporting Count 3—Laurent directly testified to witnessing Petitioner's possession of the gun, describing at length how he frequently saw Petitioner with the gun and about Petitioner's acquisition of the gun and his storage of same (Exhibit 12, Tr. III, 33-35).  Crookshanks also testified to Petitioner's admission to him regarding Petitioner's ownership of the gun (Exhibit 12, Tr. III, 44-45).  The testimony of Laurent and Crookshanks alone—with or without the discovery or admission of the gun itself—plainly provided sufficient evidence to support the jury's verdict in Count 3, and any attack on the credibility of the gun-related evidence overall would have failed.  *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (emphasis in original)).

Finally, as in state court (Exhibit 4 at 14), Petitioner also suggests appellate counsel should have raised various constitutional challenges: "[T]he unavailability of David Laurent during Jury Trail [sic] violated Petitioner's Sixth Amendment right under the confrontation clause as well as the Fifth Amendment right to present a complete defense" and his right to "due process."  Doc. 2 at 4.  He further points to alleged inconsistencies in the trial testimony—Laurent testified Petitioner purchased the gun from Robert Hughes, while Crookshanks testified Petitioner purchased the gun from Shane Warden (Exhibit 12,

Tr. III, 34, 45-46), and Williams's testimony contained unspecified "contradiction[s]"—and complains the State committed violations under *United States v. Bagley*, 473 U.S. 667 (1985), and *Napue v. Illinois*, 360 U.S. 264 (1959) (Exhibit 4 at 14-15). Doc. 2 at 4-5. Piggybacking on these allegations, he also complains that the lack of testimony from Warden and Hughes regarding the "pistol's origin" violated his right to "confrontation" (Exhibit 4 at 15). Doc. 2 at 5.

Appellate counsel reasonably decided against raising these various constitutional challenges, as they are entirely without merit. Petitioner does not actually point to any out-of-court, testimonial statements that were improperly admitted in violation of the Confrontation Clause,[19] nor does he show any testimony that was actually "false." *See Crawford v. Washington*, 541 U.S. 36, 59 (2004) (testimonial, out-of-court statements are prohibited by the Confrontation Clause unless the witness is unavailable and the defendant had the prior opportunity to cross-examine witnesses); *United States v. Caballero*, 277 F.3d 1235, 1244 (10th Cir. 2002) ("inconsistency alone does not establish the knowing use of perjured testimony" in violation of *Napue*). Rather, Petitioner's complaints are again, at bottom, challenges to the sufficiency of the evidence that would have been unsuccessful on appeal as explained above. Likewise, Petitioner does not point to any evidence or testimony that he was prevented from presenting in violation of his right to present a defense. Rather, as the State noted in responding to Petitioner's post-conviction

---

[19] Nor does the record reveal any. For instance, when Investigator Neff testified regarding the retrieval of the gun from David Laurent's car, the trial court sustained the defense's objections to Investigator Neff testifying to any statements by David Laurent (Exhibit 12, Tr. III, 11-12).

application, "Petitioner was free to call those witnesses to testify, but chose not to, as the Constitution guarantees him compulsory process for obtaining witnesses in his favor" (Exhibit 5 at 6 (quotation marks omitted)). A fairminded jurist could agree with the OCCA's rejection of Petitioner's argument that appellate counsel should have raised various constitutional challenges in relation to the evidence supporting Count 3.

## C.   Conclusion

For all these reasons, Petitioner has failed to carry his burden of showing that no fairminded jurist could agree with the OCCA's rejection of his ineffective assistance of appellate counsel claim. *See Richter*, 562 U.S. at 103. In particular, Petitioner has fallen woefully short of demonstrating that his arguments in Ground One are clearly stronger than the three-proposition brief appellate counsel filed. *See Robbins*, 528 U.S. at 288. Indeed, Petitioner's proffered arguments are without merit, and thus counsel was clearly not ineffective in failing to raise them on direct appeal. *See Miller*, 354 F.3d at 1298. Habeas relief must be denied.

## GROUND TWO

**THE OCCA'S REJECTION OF PETITIONER'S INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIM FOR FAILING TO RAISE A PROPOSITION REGARDING IMPEACHMENT INSTRUCTIONS WAS NEITHER CONTRARY TO *STRICKLAND V. WASHINGTON* NOR LEGALLY OR FACTUALLY UNREASONABLE.**

In his second ground for relief, Petitioner contends that appellate counsel should have challenged the trial court's failure to offer various "impeachment" instructions. Doc. 2 at 6-7. The record reveals, however, that the instructions Petitioner identifies were either

actually given to the jury or were not warranted under the law and facts.  A fairminded

jurist could agree with the OCCA's rejection of this claim.  Habeas relief should be denied.

## A.    Background

As previously stated, direct appeal counsel raised three propositions of error

(Exhibit 1 at 3; *see also* Exhibit 2 at i, 8-18).  On post-conviction, however, Petitioner

claimed appellate counsel should have argued, *inter alia*, that the trial court improperly

failed to give the jury certain "impeachment" instructions (Exhibit 4 at 16-17).  The state

district court rejected this claim as follows:

> The Defendant next contends that his appellate counsel should have
> raised the issue that the jury was not properly instructed with instructions
> OUJI-CR 9-20, 9-21, and 9-22.  The jury was instructed with instructions
> OUJI-CR 9-20 and 9-22. Instruction OUJI-CR 9-20 addressed the prior
> inconsistent testimony of only Brock Laurent.  There was no other witness
> testimony that warranted this instruction. Instruction OUJI-CR 9-22
> addressed the prior convictions of Eric Julian, Brock Laurent, and Dale
> Crookshanks.  This instruction was not warranted for any other witness and
> the Defendant does not contend otherwise.  Instruction OUJI-CR 9-21 was
> not given to the jury and was not requested by trial counsel. *See*, Defendant's
> Submission of Jury Instructions to the Court filed on April 4, 2018.  The
> Defendant contends that this instruction should have been given concerning
> the drug use by Julian, Laurent, and Crookshanks.  Instruction OUJI-CR 9-
> 21 concerns impeachment evidence of a witness' conduct that may affect his
> credibility.  There was no evidence presented about these witness' drug
> possession or use that warranted this instruction.

(Exhibit 6 at 2-3).  As quoted in Ground One, the OCCA rejected Petitioner's ineffective

assistance of appellate counsel claims on the merits on both prongs (Exhibit 9 at 2-4).

## B.    Application of § 2254(d)

Petitioner has failed to demonstrate that no fairminded jurist could agree with the

OCCA's rejection of his claim of ineffective assistance of appellate counsel for failing to

argue error in the trial court's failure to give various "impeachment" instructions.   For

starters, as already shown in Ground One, the OCCA's decision was not contrary to clearly

established Supreme Court law, as it correctly identified *Strickland* and its two-part test as

governing this claim (Exhibit 9 at 3).  *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at

405-06; *Hooks*, 689 F.3d at 1167.

Nor was the OCCA's opinion legally or factually unreasonable under the remaining

provisions of § 2254(d).  As previously stated, the OCCA "agree[d]" with the state district

court that Petitioner had not shown the ineffective assistance of appellate counsel (Exhibit

9 at 2).  As the district court explained, and the OCCA appeared to find persuasive, all of

the instructions Petitioner complains his jury should have received were actually provided

or were not warranted under the facts and the law (Exhibit 6 at 2-3).

*First*, Petitioner says the jury should have received Instruction No. 9-22 regarding

Crookshanks's eleven prior felony convictions (Exhibit 4 at 16).   Doc. 2 at 6; *see*

Instruction No. 9-22, Oklahoma Uniform Jury Instructions—Criminal (Second Edition)

(hereafter, "OUJI-CR(2d)") (Supp. 2000) ("Evidence has been presented that **[Name of**

**Witness]** has heretofore been convicted of **(a criminal offense)/(criminal offenses)**. This

evidence is called impeachment evidence . . . .").  However, as the state district court found,

the jury in fact *did* receive Instruction No. 9-22, specifically with regard to Crookshanks

(as well as Laurent and Julian) (Exhibit 11, O.R. II, 238).   This finding is entitled to a

presumption  of  correctness  that  Petitioner  has  not  rebutted  by  clear  and  convicting

evidence, *see* 28 U.S.C. § 2254(e)(1), and in any event it is plainly established by the

original record.[20]

*Second*, Petitioner turns his attention to Instruction No. 9-21, arguing that the jury

should have received that instruction as to Crookshanks, Laurent, and Julian "for prior bad

acts" of drug use (Exhibit 4 at 16-17).  Doc. 2 at 6-7.  Instruction No. 9-21 states:

> Evidence has been presented that . . . **([Name of Witness])** has committed
> conduct that may affect **his/her** credibility.  This evidence is called
> impeachment evidence, and it is offered to show that the . . . **witness's**
> testimony is not believable or truthful.  If you find that this conduct occurred,
> you may consider this impeachment evidence in determining what weight
> and credit to give the credibility of . . . **([Name of Witness])**.  You may not
> consider this impeachment evidence as proof of innocence or guilt.  You may
> consider this impeachment evidence only to the extent that you determine it
> affects the believability of the . . . **witness**, if at all.

Instruction No. 9-21 OUJI-CR(2d) (Supp. 2000).  Although there is a lack of published

OCCA case law on Instruction No. 9-21, the OCCA held in *State v. Le*, Case No. F-2016-

1119, Summary Op. at 15 (Okla. Crim. App. Feb. 15, 2018) (unpublished) (attached as

Exhibit 12), that Instruction No. 9-21 was not warranted based on certain witnesses' past

drug use because the evidence was *res gestae* of the crime charged and was not admitted

---

[20] To the extent Petitioner means that Instruction No. 9-22, as given the jury, should have
specified that Crookshanks had *eleven* prior felony convictions (Exhibit 4 at 16), this
contention is without merit.  Even defense counsel's proposed Instruction No. 9-22 on
Crookshanks stated that he had been "convicted of a [sic] criminal offenses" without
specifying how many (Exhibit 4 at 16), so Petitioner's argument, if raised on appeal, would
have been rejected as invited error.  *See Cuesta-Rodriguez v. State*, 241 P.3d 214, 237
(Okla. Crim. App. 2010) ("Cuesta-Rodriguez did not object to this language at trial, and in
fact, included it in his own proposed jury instruction.  For that reason, this claim is waived
as invited error.")  In any event, the jury was well aware of the length of Crookshanks's
criminal history, as the State elicited each of his prior convictions on direct and defense
counsel highlighted that he had a total of eleven prior convictions on cross (Exhibit 10, Tr.
I, 77-78, 102-03).

as impeachment evidence.   Under Oklahoma law, *res gestae* evidence is that which "incidentally emerges" from evidence of the charged crime and is "necessary to give the jury a complete understanding of the crime" or "is central to the chain of events." *Eizember v. State*, 164 P.3d 208, 230 (Okla. Crim. App. 2007) (quotation marks omitted).

Here, as the state district court noted (Exhibit 6 at 3), defense counsel did not request Instruction 9-21 be given at trial (Exhibit 11, O.R. II, 148-207), meaning appellate counsel would have faced the rigorous plain error standard of review had she raised this claim on direct appeal.   *See Hogan v. State*, 139 P.3d 907, 923 (Okla. Crim. App. 2006) (requiring a four-part showing for relief, including demonstrating plain or obvious error and an effect on the outcome of trial).   In any event, appellate counsel could not have shown error, plain or otherwise.   As the state district court reasoned, Petitioner has not pointed to any evidence of prior drug use that was admitted as impeachment evidence (Exhibit 5 at 3).   As to Laurent and Julian, the evidence of drug use was all *res gestae*: the men's drug addictions explained their connection to Petitioner and his drug distribution scheme (Exhibit 10, Tr. I, 253-54; Tr. II, 14-17).   Testimony regarding Crookshanks's drug use was initially elicited because of his prior drug-related convictions (Exhibit 10, Tr. II, 77-78).   As stated above, the jury was already instructed as to the impeachment purpose of Crookshanks's convictions through Instruction No. 9-22 (Exhibit 11, O.R. II, 238).   The additional testimony regarding Crookshanks's drug use was also *res gestae*, as Crookshanks's experience with drugs was a necessary foundation to his testimony that Petitioner gave him both a recipe on how to make methamphetamine and Petitioner's uncle's phone number to help him get heroin to secure Petitioner a new attorney (Exhibit 12, Tr. II, 86-89, 95; St.

Ex. 15). Because none of the testimony regarding drug use by these witnesses was impeachment evidence, Instruction 9-21 was not warranted under Oklahoma law. *See Le*, Summary Op. at 15 (Exhibit 12) (Instruction 9-21 not warranted where "none of the evidence referred to by Appellant," including evidence of drug use, "was impeachment evidence").

*Third and finally*, Petitioner complains of various instances in which the jury did not receive Instruction 9-20 (Exhibit 4 at 16-17). Doc. 2 at 6-7; *see* Instruction No. 9-20 OUJI-CR(2d) (Supp. 2009) ("Evidence has been presented that on some prior occasion . . . **([Name of Witness]) (made a statement)/(acted in a manner)** inconsistent with **his/ her** testimony in this case. This evidence is called impeachment evidence . . . ."). The state district court noted that "Instruction OUJI-CR 9-20 addressed the prior inconsistent testimony of only Brock Laurent," and "[t]here was no other witness testimony that warranted this instruction" (Exhibit 5 at 3). Indeed, the other testimony identified by Petitioner does not fall within the gambit of Instruction No. 9-20. Petitioner simply identifies instances in which witnesses were inconsistent in their trial testimony *as compared to each other*—he does not identify any instance in which a witness made a prior statement inconsistent with his or her own trial testimony. Doc. 2 at 6 (complaining that Laurent and Crookshanks were inconsistent as to how Petitioner obtained the gun and what substances Williams possessed upon being pulled over). Based on the plain language of Instruction No. 9-20, inconsistencies between two or more witnesses's testimonies does not warrant the instruction.

For the reasons explained, a fairminded jurist could agree with the OCCA's rejection of Petitioner's argument that appellate counsel should have raised the afore-discussed instructional claims.

## C.     Conclusion

For all these reasons, Petitioner has failed to carry his burden of showing that no fairminded jurist could agree with the OCCA's rejection of his ineffective assistance of appellate counsel claim. *See Richter*, 562 U.S. at 103. In particular, Petitioner has failed to demonstrate that his arguments in Ground Two are clearly stronger than the three-proposition brief appellate counsel filed. *See Robbins*, 528 U.S. at 288. Indeed, Petitioner's proffered arguments are without merit, and thus counsel was clearly not ineffective in failing to raise them on direct appeal. *See Miller*, 354 F.3d at 1298. Habeas relief must be denied.

<u>**GROUND THREE**</u>

**THE OCCA'S REJECTION OF PETITIONER'S INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIM FOR FAILING TO RAISE A SUFFICIENCY CHALLENGE TO COUNT 3 WAS NEITHER CONTRARY TO *STRICKLAND V. WASHINGTON* NOR LEGALLY OR FACTUALLY UNREASONABLE.**

In his third and final ground for relief, Petitioner contends that appellate counsel rendered ineffective assistance in failing to challenge the sufficiency of the evidence as to Count 3, possession of a firearm by a convicted felon. Doc. 2 at 7-9. However, any such claim would have been utterly without merit, as two witnesses testified to Petitioner's

possession of a handgun.  A fairminded jurist could agree with the OCCA's rejection of this claim.  Habeas relief should be denied.

## A.    Background

As previously stated, direct appeal counsel raised three propositions of error (Exhibit 1 at 3; *see also* Exhibit 2 at i, 8-18).  On post-conviction, however, Petitioner claimed appellate counsel should have argued, *inter alia*, that the evidence was insufficient to support Count 3 because the State failed to show that he possessed the .380 pistol (Exhibit 4 at 17-19).  The state district court rejected this claim as follows:

> The Defendant finally contends that his appellate counsel should have argued that there was insufficient evidence to convict him of the offense of Possession of Firearm After Felony Conviction.  As mentioned above, the .380 handgun was found in the trunk of David Laurent's father's car loaded with PMC ammunition.  This same ammunition was found in a black duffle bag with numerous papers with the Defendant's name during the first of Laurent's residence.  Also, both Laurent and Crookshanks testified that the Defendant had a .38 or .380 caliber handgun and Laurent testified that it was a "Bertaloni."  There was sufficient evidence presented to the jury for them to unanimously find the Defendant guilty of this offense.

(Exhibit 5 at 3).  As quoted in Ground One, the OCCA rejected Petitioner's ineffective assistance of appellate counsel claims on the merits on both prongs (Exhibit 9 at 2-4).

## B.    Application of § 2254(d)

Petitioner has failed to demonstrate that no fairminded jurist could agree with the OCCA's rejection of his claim of ineffective assistance of appellate counsel for failing to challenge the sufficiency of the evidence as to Count 3.  To begin with, as already shown in Ground One, the OCCA's decision was not contrary to clearly established Supreme Court law, as it correctly identified *Strickland* and its two-part test as governing this claim

(Exhibit 9 at 3). *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405-06; *Hooks*, 689 F.3d at 1167.

Nor was the OCCA's opinion legally or factually unreasonable under the remaining provisions of § 2254(d). Had appellate counsel raised a claim of insufficient evidence, the OCCA would have "view[ed] the evidence in the light most favorable to the prosecution," asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). Further, the OCCA would have deferred to the jury's resolution of conflicts in the testimony, weighing of the evidence, and drawing of reasonable inferences. *Id.* Finally, the OCCA's sufficiency review would have considered all of the evidence before the jury, regardless of whether the evidence was properly admitted. *McDaniel v. Brown*, 558 U.S. 120, 131 (2010).

Based on the arguments Petitioner proffers for his proposed sufficiency claim, appellate counsel could not possibly have overcome *Jackson* deference. As with Ground One, Petitioner points to various alleged shortcomings, inconsistencies, and admissibility problems with the State's evidence. Doc. 2 at 7-9 (complaining, as examples, that "no mail has ever been delivered to the address of the property in the legal name of Petitioner," the State failed to present "forensic evidence of immediate control or evidence of the pistol in any vehicle Petitioner operates or any vehicle which Petitioner has been riding as a passenger," the Laurent men could have conspired to pin the gun on Petitioner, and "[t]he stories conflict regarding the origin of the pistol"). None of this, however, shows that the evidence actually before the jury was so lacking that no reasonable juror could have found

guilt beyond a reasonable doubt.  *See McDaniel*, 558 U.S. at 131; *Jackson*, 443 U.S. at 319.

Indeed, any juror clearly could have reasonably found Petitioner guilty of Count 3 because,

as observed by the state district court, Laurent testified to seeing Petitioner possess a

handgun and Crookshanks testified to Petitioner's admission to same (Exhibit 5 at 3;

Exhibit 12, Tr. III, 33-35, 44-45).  This was not a case where a handgun was found in a

shared residence and the State had only circumstantial evidence as to who possessed it.

Rather, two witnesses quite literally put the gun in Petitioner's hands, and the jury's finding

that these men were credible would not, and could not, have been second-guessed on

appeal.  *See Jackson*, 443 U.S. at 318-19.[21]

    For the reasons explained, a fairminded jurist could agree with the OCCA's

rejection of Petitioner's argument that appellate counsel should have challenged the

sufficiency of evidence in Count 3.

## C.    Conclusion

    For all these reasons, Petitioner has failed to carry his burden of showing that no

fairminded jurist could agree with the OCCA's rejection of his ineffective assistance of

---

[21] To the extent Petitioner hints at an argument that the State did not disprove all reasonable hypotheses regarding who possessed the gun, and whether the Laurent men conspired to pin it on him, his argument is entirely misplaced.  Oklahoma long ago did away with the "reasonable hypothesis test" for sufficiency claims.  *Easlick v. State*, 90 P.3d 556, 559 (Okla. Crim. App. 2004) (abandoning "reasonable hypothesis test" because of its reliance "on antiquated ideas concerning the value of circumstantial evidence" and adopting "the *Spuehler* [*i.e.*, *Jackson*] standard, regardless of whether the evidence is wholly circumstantial or whether it is based in whole or in part on direct evidence" (citing *Spuehler v. State*, 709 P.2d 202, 203-04 (Okla. Crim. App. 1985))).  In any event, this former test was limited to cases involving wholly circumstantial evidence.  *Id.*  As discussed ad nauseum, the State's case here was not circumstantial—two witnesses provided direct evidence of Petitioner's possession of a handgun.

appellate counsel claim. *See Richter*, 562 U.S. at 103. In particular, Petitioner has fallen well short of demonstrating that his sufficiency arguments in Ground Three are clearly stronger than the three-proposition brief appellate counsel filed. *See Robbins*, 528 U.S. at 288. Indeed, Petitioner's proffered arguments are without merit, and thus counsel was clearly not ineffective in failing to raise them on direct appeal. *See Miller*, 354 F.3d at 1298. Habeas relief must be denied.

## CONCLUSION

Based on the above and foregoing law and reasoning, federal habeas corpus relief is unwarranted. Petitioner's petition for federal habeas corpus relief should therefore be denied in its entirety by this Court.

Respectfully submitted,

**JOHN M. O'CONNOR**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ CAROLINE E.J. HUNT**
**CAROLINE E.J. HUNT, O.B.A. #32635**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Fax: (405) 522-4534
Service email: fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT**

## <u>CERTIFICATE OF SERVICE</u>

**<u>X</u>**      I hereby certify that on January 11, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.

**<u>X</u>**      I hereby certify that on January 11, 2022, I served the attached document by mail on the following:

Joey Elijio Adames, #611097
LAWTON-LCF
8607 SE Flower Mound Rd
Lawton, OK 73501

<u>s/ Caroline E.J. Hunt</u>